# Rittenhouse *against* Levering.

Where a surety has done no act before his claim is barred at law, manifesting his intention to put himself in the place of the original creditor and thereby subrogating himself to his rights, such as bringing suit on the bond within the six years or taking an assignment of it, his remedy is not on the bond but for money paid : and a court of equity will not after the six years subrogate him to the rights of the obligee.

A surety will be subrogated within the six years, where he has paid the money and the original security remains intact; and the fact that there was no assignment or actual substitution within that time will be disregarded ; for while the legal right remains, it draws to itself all the consequences of an actual substitutution in a court of equity.

A surety is not *ipso facto* on payment of the debt of his principal subrogated to the creditor's rights : his remedy is not *primâ facie* on the bond but for money paid.

Where a deed is joint or both joint and several, the defendant, who is sued, may show that the seal of one of the obligors has been torn off. But it is otherwise where the obligation is entirely several.

The monies paid to the distributees or the advancement to one or more of the children of the intestate form no part of an administration account.

The decree of the Orphan's Court confirming an administration account which admits a balance in the hands of the administrators for distribution, and in which as well as in the inventory filed one of the distributees is charged as a debtor, is *primâ facie*, but not conclusive evidence of such debt; and in an action by such distributee to recover his share of the estate, he may prove that he owed the estate nothing.

In relation to distribution of an estate, the District Court have concurrent jurisdiction with the Orphan's Court.

The District Court have jurisdiction of a suit by a distributee against the administrators for his share of the estate, where a final settlement has been made of their accounts in the Orphan's Court, showing a balance in their hands for distribution.

A surety of a surety who has paid and discharged the obligation, has the same equity of subrogation as the surety to whom he was bound.

ERROR to the District Court for the city and county of *Philadelphia*.

[Rittenhouse v. Levering.]

This was an action of *assumpsit* brought by Joseph Rittenhouse against Nicholas Rittenhouse and Jacob D. Rittenhouse, administrators of Martin Rittenhouse, deceased, the grandfather of the plaintiff, to recover a distributive share of the estate of the intestate. It appeared that Martin died in 1829, leaving six children known to be alive and three grandchildren, one of whom was the plaintiff, the issue of a seventh child, Joseph, who was supposed to be dead. The plaintiff died *pendente lite,* and his administrator was substituted.

This case was tried three times. On the first trial a verdict was rendered for the plaintiff, subject to the opinion of the court. This verdict was set aside and a new trial granted, in which a verdict and judgment were rendered for the defendants. This judgment was reversed on a writ of error taken to this court by the plaintiff, and a *venire de novo* awarded. See 4 *Whart.* 130. On a third trial a verdict and judgment were rendered for the plaintiff.

The declaration contained four counts, of which two were for money had and received. The third count stated, that " whereas the said Martin died intestate, &c. leaving neither widow nor lawful issue, nor father nor mother, but leaving brothers and sisters and leaving the said Joseph, who was the representative of a brother of the said Martin, and the said Joseph as representative of a brother of the said Martin, was entitled to receive of the remaining part of the lands, &c. and personal estate of the said Martin, &c. And the said, &c. administrators, &c. had in their hands assets sufficient to pay the said distributive share," &c.

The fourth count stated, that " whereas the said Martin died intestate, &c. leaving no widow, but leaving children and the representatives of a child : and whereas the said Joseph, &c. was one of three children of a certain other Joseph Rittenhouse, which other Joseph was a son of the said Martin and died in the lifetime of the said Martin, leaving the said Joseph, &c. alive at the time of the death of said Martin and the said Joseph, &c., as one of the grandchildren of the said Martin, his grandfather, was and is entitled to receive of the remaining part of the lands, &c. and personal estate of said Martin, &c. and the said administrators had assets sufficient to pay, &c. the said distributive share."

The plaintiff gave in evidence the inventory and appraisement of the personal estate of Martin Rittenhouse, amounting to $8969.32½, the last item of which was : " Joseph Rittenhouse, Dr to sundry charges $4465.75." Also the following account :

[Rittenhouse v. Levering.]

DR.  Nicholas Rittenhouse and Jacob D. Rittenhouse, Administra-
tors to the Estate of Martin Rittenhouse, late of Roxborough
Township, deceased, in Account with said Estate.          CR.

| The said accountants charge themselves with amount of inventory filed in register's office .................... | $8969 | 32 | The said accountants crave allowance for the following disbursements made out of said estate aforesaid, to wit: | | |
|---|---|---|---|---|---|
| To interest received on personal and real estate ........ | 1147 | 92 | By cash paid register for letters of administrat'n | $ 2 | 75 |
| " advance on sale of personal estate ................. | 46 | 76 | " cash paid for expenses of funeral, per receipts | 132 | 18 |
| " debt due by Nich. Rittenhouse to estate ........... | 292 | 31 | " amount allowed Jacob C. Rittenhouse ...... | 27 | 50 |
| " debt due by Jacob D. Rittenhouse to estate ....... | 658 | 80 | " cash paid for stating account to Murphy ... | 3 | 00 |
| Estate in Montgomery county, sold by order of Orphans' Court .................. | 2751 | 00 | " cash paid for stating second account ...... | 3 | 00 |
| | | | Register's fees, and fees Clerk Orphans' Court . | 9 | 69 |
| | | | Commissions allowed administrators for their care and trouble in settling said estate, on $13,866.11 ... ... | 250 | 00 |
| | | | Balance in the hands of administrators to be distributed according to law ........ | 13437 | 99 |
| | $13866 | 11 | | $13866 | 11 |

DR.  Nicholas Rittenhouse and Jacob D. Rittenhouse in Distribu-
tive Account with the Heirs of Martin Rittenhouse, dec'd.  CR.

| To balance due estate brought down .................. | $13437 | 99 | By so much paid Thos. Ulmstead, per receipt..... | $ 1484 | 00 |
|---|---|---|---|---|---|
| Property in Philadelphia co., real estate, valued by sheriff's inquest at .......... | 9600 | 00 | " Joseph Rittenhouse.... | 4465 | 75 |
| | | | " Susan Nixon ......... | 1525 | 92 |
| | | | " Philip Reynar ........ | 1060 | 00 |
| | | | " Martin Rittenhouse.... | 1503 | 30 |
| | | | Balance due heirs .......... | 12999 | 02 |
| | $23037 | 99 | | $23037 | 99 |

The said administrators, duly affirmed, say that this a~count, as it stands stated and settled, both as to their charge and discharge thereof, is just and true to the best of their knowledge and belief.
          NICHOLAS RITTENHOUSE,
          JACOB RITTENHOUSE.
Affirmed and subscribed before }
me, May 7, 1830.                  }
          B. SEWALL, Dep. Register.

*Philada. City and County, ss.*
          I certify the foregoing to be a true copy of the original account, as filed in the Register's Office for the city and county of Philadelphia.

Given under my hand and seal }
of office, this 25th day of   }
April, A. D. 1832.            }
          J. HUMES, Register.

This account was confirmed *nisi* by the Orphans' Court on the 18th of June 1830, and no exceptions to it appeared to have been filed.

The plaintiff then called a witness who stated that he saw

Joseph Rittenhouse, the elder, in Maryland, in November 1819; that he left home more than four or five years previous.

The defendants then gave in evidence an account or memorandum, admitted to be in the handwriting of Joseph Rittenhouse, in which he was charged with several sums of money as due from him to Martin Rittenhouse. Also an account stated between Martin and Joseph, dated 19th August 1794, in which certain errors were corrected, and the balance stated in Joseph's handwriting. Also a receipt in the handwriting of Joseph, with the endorsements in the handwriting of Martin, for Peter Care's note, dated 10th January 1795. Also a bond, with the endorsements thereon, dated 17th September 1792, given by Joseph and Jacob Rittenhouse to John Johnson for the payment of £500 with interest on the 17th September next ensuing its date. The name and seal of Jacob to this bond had been erased. The last receipt endorsed on the bond was in these words :

Rec'd 1st mo. 2d 1812, of Nich's Rittenhouse, the amount of the within bond, both principal and interest, in full.

JOHN JOHNSON.

They also gave in evidence a bond dated 1st February 1794, given by Joseph and Martin Rittenhouse to Jacob Rittenhouse, reciting the former bond, and that Jacob became bound in it with Joseph at his special instance and request. The condition was that Joseph should pay John Johnson £500 on 7th September next ensuing, and that Joseph and Martin should save harmless and indemnify Jacob from all damages, &c., which he might thereafter be put to by reason of his being bound with Joseph. The seal of Martin to this bond had been torn off.

The defendants then called one of the executors of Jacob Rittenhouse, who testified that Nicholas Rittenhouse, as the agent of his father Martin, paid witness the original bond in 1812, and witness gave him up the indemnifying bond. At the time Nicholas brought the bond, he said that he paid it for his father. Witness did not recollect of Joseph's being in that part of the country at that time.

Another witness then stated that Joseph Rittenhouse left home about 1785 or 1788, and that Martin said he had not heard from him since the burning of the Richmond theatre.

The defendants then gave in evidence the record of the Orphans' Court of the county of Philadelphia, showing that the above-mentioned account settled by the defendants as administrators of Martin Rittenhouse, had been confirmed *nisi* by the Orphans' Court on the 18th June 1830, and no exceptions had been filed thereto.

The defendants requested the court to instruct the jury on the following points :

1. That even if the bond to John Johnson was paid by Martin

VI. — 25　　　R

Rittenhouse, as the surety of Joseph Rittenhouse, before the death of Joseph, the debt, which thus became due from Joseph to Martin, was not barred by the Act of Limitations.

Answer. This is not correct; the law is directly otherwise.

2. That the decree of the Orphans' Court upon the accounts of the defendants as administrators of Martin Rittenhouse, deceased, was conclusive, and that therefore the plaintiff was not entitled to recover.

Answer. I negative this proposition also.

The defendants assigned the following errors.

1. The judge erred in his answer to the first question submitted to him by the defendants.

2. In his answer to the second question submitted to him by the defendants.

3. There was no allegation on record, nor was there any proof, that a final settlement of the accounts of the defendants as administrators of Martin Rittenhouse, deceased, had been made in the Orphan's Court, and the clear balance for distribution ascertained, without which the court below had no jurisdiction of the subject-matter of the suit.

4. It appears from the record that the court below had no jurisdiction of the subject-matter of the suit.

5. The several counts in the declaration, particularly the third and fourth, are utterly incongruous and inconsistent with each other; and the verdict on which the judgment below was entered being general, the said judgment is erroneous.

The cause was argued at December Term 1842 by *Brooke* and *Rawle* for the plaintiffs in error, and by *Jack* and *Randall* for the defendant in error; and was now re-argued by

*Rawle*, for the plaintiffs in error. A surety who has paid the debt of his principal, is entitled to be subrogated to all the rights of the creditor without any actual assignment of the security. The right of substitution is everything, the actual substitution nothing. Payment of the debt by the surety does not extinguish the security: equity keeps it alive for his benefit. *Millard* v. *Cheesebrough*, (1 *Johns. Ch.* 409); *Hayes* v. *Ward*, (4 *Ib.* 130); *Avery* v. *Petten*, (7 *Ib.* 211); *Fleming* v. *Beaver*, (2 *Rawle* 131); *Cooper* 61; *Burns* v. *Huntingdon Bank*, (1 *P. R.* 395); *Mehaffy* v. *Share*, (2 *Ib.* 378); *Dorsheimer* v. *Bucher*, (7 *Serg. & Rawle* 9); *Sterling* v. *Brightbill*, (5 *Watts* 231); *Kyner* v. *Kyner*, (6 *Ib.* 224); *Croft* v. *Moore*, (9 *Ib.* 451). The exceptions to the rule are founded on particular circumstances, such as omitting to sue within the period of limitation, or paying only part of the debt: *Bank of Pennsylvania* v. *Potius*, (10 *Watts* 148); or the existence of intervening creditors. *Pott* v. *Nathans*, (1 *Watts & Serg.* 155); *Himes* v. *Keller*, (3 *Ib.* 401). Here the intestate paid the bond for his son Joseph, and claims to be substituted to the rights of Johnson, the obligee. The tearing off

his seal was no more than a payment and receipt, and does not extinguish the security in equity.

The decree of the Orphan's Court confirming the account of an executor is conclusive as to all matters contained in it, in an action for a distributive share or in any collateral suit. *M'Fadden* v. *Geddis*, (17 *Serg. & Rawle* 336). It is not sufficient to say there are irregularities on its face: these could be rectified only on appeal, and cannot be inquired into in a suit for a distributive share, whether they are matters of charge or of discharge. *M'Pherson* v. *Cunliff*, (11 *Serg. & Rawle* 422); *M'Lenachan* v. *Commonwealth*, (1 *Rawle* 361); *M'Pherson's Adm'rs.* v. *Rees*, (2 *P. R.* 521); *Clark* v. *Callaghan*, (2 *Watts* 259); *Snyder* v. *Markel*, (8 *Ibid.* 416); *Gallaher* v. *Collins*, (7 *Ibid.* 552); *Richter* v. *Fitzsimmons*, (4 *Ibid.* 251); *Galbraith* v. *Galbraith*, (6 *Watts* 112); *Blanchard* v. *The Commonwealth*, (6 *Watts* 309). The decree of the Orphan's Court was held conclusive before the passage of the Act of 29th March 1832, and now, by the 2d section of that Act, it is expressly made so.

If, then, the Orphan's Court has passed on all these matters, and decreed that the debt of $4465.75 was due by Joseph, and found the balance due the heirs, the District Court cannot entertain the question of the existence of the debt. That is a fact appearing by the record, and cannot be disputed. *Selin* v. *Snyder*, (7 *Serg. & Rawle* 172); *Kennedy* v. *Wachsmuth*, (12 *Ibid.* 171). The Orphan's Court may have considered it either as an advancement or payment, and if they even improperly considered it as a payment, it is binding on all who stood by and did not assert their rights by coming in and excepting to the account, and thereby lulled the administrators into security, and induced them to go on and distribute the estate. To such a proceeding all who are interested are parties, and have a right to be heard, and are bound to come in under the advertisements. It is in the nature of a proceeding *in rem*. Even the Orphan's Court could not modify their decree after money had been paid under it, so as to make a party pay a second time. *Hassler's Appeal*, (5 *Watts* 176). The adjudication of the account of the personalty was clearly within the jurisdiction of the Orphan's Court, and under the Acts of 1713 and of 19th April 1794, the balance of sale of real estate must be ascertained in the Orphan's Court, whose duty it is to allow credits to the administrator for payments made to the heirs or distributees. *Sterrett's Appeal*, (2 *P. R.* 419); *Fromberger* v. *Greiner*, (5 *Whart.* 350).

He further insisted that as the account, if final, was conclusive, so if it was alleged not to be final, the suit in the District Court was premature. All the cases show that a balance must be first settled there before an action at law can be brought. *Wilson* v. *Wilson*, (3 *Binn.* 557); *App* v. *Driesbach*, (2 *Rawle* 301); *M'Lenachan* v. *Commonwealth*, (1 *Rawle* 361); *Purviance* v. *The Common-*

*wealth,* (17 *Serg. & Rawle* 31); *Earnest* v. *Earnest,* (5 *Rawle* 213).

The declaration is defective. One count blends together the real and personal estate, and the titles laid in the two special counts are incongruous.

*Randall,* contra, insisted that the right of subrogation was not made a question in the court below, and did not arise on the points put for the instruction of the court. The first point was merely as to the simple contract debts being barred by the Statute of Limitations. The principle asked by counsel must be precise, so as to raise the question. 15 *Peters* 406; 14 *Ibid.* 321; *Wolverton* v. *Commonwealth,* (7 *Serg. & Rawle* 277). The court below had no opportunity to examine the subject of subrogation; it is new. Besides, upwards of twenty-two years had elapsed before the suit, and the presumption of payment, once commencing, runs on. *Galbraith* v. *Galbraith,* (6 *Watts* 112). The doctrine of subrogation, however, does not apply. The payment by Martin was voluntary. He was not surety to Johnson, nor liable to him. He gave the bond to Jacob two years after Jacob's bond to Johnson. There was no privity between Martin and Johnson by which the former could step in and pay and thus be subrogated to Johnson's rights. But, in addition, it is a conclusive objection that more than six years had elapsed from the time of the payment by Martin, and his claim against Joseph, at law, was gone. The legal claim being extinct, there is nothing on which the equity of subrogation can arise. The moment the legal liability is gone, the right of substitution ceases. *Fink* v. *Mahaffy,* (8 *Watts* 384); *Bank of Pennsylvania* v. *Potius,* (10 *Watts* 148). The tearing off the seal or erasure of a joint and several bond destroys it, and the defendant may show it. 2 *Stark. Ev.* 379.

The second error is also too general: no precise point is put. But an administration account is conclusive only as to matters properly introduced into it. *Kohr* v. *Fedderhaff,* (4 *Serg. & Rawle* 248); *Foulk* v. *Brown,* (2 *Watts* 214); *M'Cullough* v. *Montgomery,* (7 *Serg. & Rawle* 31). In *Sterrett's Appeal* and *M'Clenachan* v. *Commonwealth,* principally relied on, the distinction is between assets and distribution. It is impossible Joseph could have been paid as the account states, as he was absent and supposed to be dead. Certainly, merely putting such an item in the account would not bar him any more than it would a stranger. An administration account can only be conclusive of debits and credits and balance struck. If payments to third persons be interpolated, when such payments were never made, they are not barred by it. *Foulk* v. *Brown,* (2 *Watts* 214); *Levering* v. *Rittenhouse,* (4 *Whart.* 130). The last of these cases settles that the $4465.75 was not an advancement to Joseph but a debt due by him, which we have a right to show was barred by the Statute of Limitations. Its being

[Rittenhouse v. Levering.]

inserted in the inventory and account does not deprive him of the right of showing that.

As to the counts, they only state the title differently, which is the common practice. The claim is the same, the pleadings and judgment are the same, and each count is good by itself. *Arch. Plead.* 172; 1 *Chitt. Plead.* 393. The insertion of the proceeds of real estate was but surplusage, and was struck out in the charge and verdict. There was a former verdict on the same narr. and no objection was taken.

The opinion of the Court was delivered by

ROGERS, J.—The declaration contains four counts; first, money had and received, and special counts claiming a distributive share of the personal estate and a distributive share arising from the real and personal estate. The monies arising from the real estate were not taken into the calculation of the jury, and a verdict was rendered for the plaintiff's share in the personal estate only. The principal questions are raised by the charge on the Act of Limitations and the conclusiveness of the decree of the Orphan's Court. On the 17th September 1792, Joseph Rittenhouse and Jacob Rittenhouse gave a bond to John Johnson in the penal sum of £1000, conditioned to pay £500, with interest. Afterwards, viz. on the 1st February 1794, Joseph Rittenhouse, the father of the plaintiff's intestate, and Martin Rittenhouse, the defendants' intestate, executed a bond to Jacob Rittenhouse in the sum of £1000, conditioned to indemnify and save harmless Jacob, who was the surety, from the payment of the above-mentioned bond. Martin, who was the father of Jacob, paid the bond for Joseph, under whom the plaintiff claims, and this constituted one of the items of defence.

This case has been twice tried, and on the first trial the plaintiff's claim was met by the plea of the Act of Limitations. The Supreme Court, to which the case was taken by writ of error, decided that if a surety pays the debt of his principal after the death of the latter, and where no letters of administration have been taken out upon his estate, the Statute of Limitations does not begin to run until letters of administration are taken out. 4 *Whart.* 130. Under this direction the parties went to trial, and, it is insisted, that the first point was intended to raise the same question which had been already ruled. The District Court would seem to have been of this opinion, and, as we think, on good grounds; for the prayer of the defendant, fairly construed, embraces that point only, and it is conceded that no new view was taken on the argument. Indeed, the point appears to have been submitted to the court without any argument whatever. It looks very much like an experiment to test the decision on the first trial. It is, however, now said, that no new position is taken, but an additional argument is urged, bearing directly on the plea of the Act of Limitations. Conceding this to be as stated, we will exa-

[Rittenhouse v. Levering.]

mine the question on the position taken by the defendant. The allegation, as I understand it, is, that by the payment of the bond the surety is *ipso facto* subrogated to all the rights of the obligee, and by that operation, without more, he becomes a specialty creditor. From this it follows that the Act of Limitations does not apply, as the administrators, on this hypothesis, are only barred by presumption of payment arising from lapse of time. The defendants allege that the right of substitution is everything, and actual substitution is nothing. The general proposition in *Fleming* v. *Beaver* is conceded, with certain limitations which we have been compelled to make in subsequent cases. Thus in *Fink* v. *Mahaffy*, (8 *Watts* 384), it is held that the doctrine of substitution being one of mere equity and benevolence, will not be enforced at the expense of a mere legal right: a surety, therefore, whose claim against his principal for money paid on a judgment against them has been defeated at law, cannot be substituted for the plaintiff in the original judgment. This case is recognised in *The Bank of Pennsylvania* v. *Potius*, (10 *Watts* 152), and must, therefore, be considered as settled. Where the surety has done no act before his claim is barred at law manifesting his intention to put himself in the place of the original creditor, and thereby subrogating himself to his rights, the remedy is only for money paid. Where he has omitted to bring suit in proper time, or to do some acts equivalent thereto, he cannot afterwards be subrogated to the rights of the creditor. It is a general principle that equity follows the law, and where right does not exist at law, a Court of Chancery will not afford the party equitable relief.

In addition to this ground, an insurmountable difficulty arises from the cancellation of the bonds by the erasures of the signatures of Jacob and Martin. By whom the erasures were made, does not appear, nor is it material. That such an erasure destroys the validity of a bond, has been repeatedly ruled; and this is a conclusive answer to the attempt, to subrogate the surety to the right of the creditor; and this results from the act of cancellation, independently of the intention of the parties. When a deed is a joint one, or both joint and several, the defendant, who is sued, may show that the seal of one of the obligors has been torn off, for the manner of the obligation becomes different, and a presumption arises that the obligee has been satisfied. But it is otherwise where the obligation is entirely several. 2 *Stark. Ev.* 379, 380; 2 *Show.* 29; *Bac. Ab.* title "*Evidence*," 652; *Bul. N. P.* 268. The case of *Seaton* v. *Henson*, (2 *Show.* 29,) where this principle was first applied to a joint and several obligation, was this. Four persons were bound in a joint and several bond, and did each of them seal and deliver the same. The seal of one was broken off. The obligee sues the defendant whose seal was still affixed to the bond. He pleads the special matter, and concludes *non est factum*. The question was if the bond hereby became void as to all the obligors,

or only to him whose seal was torn off. The court decided it entirely destroyed the bond.

If the bond is null and void, it is difficult to imagine what remains on which the subrogation can operate. By a subrogation, the surety is placed in no better situation than the obligee; and as he could recover nothing, the surety is placed in the same predicament. Subrogation of a surety, where he has paid the money and the original security remains intact, has been so repeatedly ruled that it is not now an open question; and although the surety in the case in hand was one remove from the original creditor, yet in a proper case we see no objection to subrogate him to the rights of the obligee. Having paid and discharged the obligation, he has the same equity as the surety to whom he was bound. A payment by him can in no case be considered voluntary; for a payment by a person who can be compelled to pay is not voluntary, so as to debar the party paying from a right of action. It may be his only mode to save himself, and from the moment the money is paid, the right of action against the obligor is complete. Why, therefore, the benefit of a principle which is based in equity should be denied to him, it is difficult to perceive. It throws the obligation on the person bound to pay, by placing the surety in the situation of the original creditor. But in this case, so far as appears, the surety did no act manifesting any intention whatever to avail himself of the equitable principle which is now invoked for the protection of his administrators. The reverse would indeed seem to be the case. He took no assignment of the bond; commenced no suit upon it. On the contrary, the bond itself is destroyed by the erasure of the name and seal of one of the co-obligors. If the obligation had been in a perfect state, and a suit had been brought upon it in proper time, the principle asserted in *Fleming* v. *Beaver* would apply. The fact that there was no assignment or actual substitution on the bond, would in such a case be disregarded; for while the legal right remains, (that is, as ruled in *Fink* v. *Mahaffy*, and *The Bank* v. *Potius*, for six years,) the right draws to itself all the consequences of an actual substitution in a court of equity.

Although I am not aware that this precise point has been elsewhere so ruled, yet it is inconceivable to me that a court of chancery would undertake to decree a substitution at any distance of time, and after all remedy in a court of law was barred; for there would be one rule of property in one court, and a different rule in another court. But rules of property are the same in all courts; for the well-settled principle is that, except as to the remedy, equity follows the law. The error on this head arises from the assumption that *ipso facto* on payment of the money, the surety is subrogated to the rights of the creditor; whereas the remedy is not *primâ facie* on the bond, but for money paid: although the surety may, if he chooses, invoke the aid of the equitable principle

[Rittenhouse v. Levering.]

of subrogation. A contrary doctrine, and particularly in the case of judgment creditors, would be inconvenient, if not productive of injustice. It would be a manifest hardship in many cases to destroy the lien of a junior judgment creditor, who may know of the actual payment of a prior judgment and act on that knowledge, and to subrogate a surety to the rights of the prior judgment creditor at any time before the expiration of twenty years. In the distribution of money arising from sheriffs' sales, we have difficulties enough already without superadding another, rendering it almost impossible to know when junior judgment creditors are secure. There is neither injustice nor hardship in putting sureties on the same footing as others. A surety may lose a right by his neglect, and more especially where by his supineness he jeopards the rights of others.

But is the decree of the Orphan's Court conclusive? In the inventory, Joseph Rittenhouse is returned as a debtor to the estate of $4465.75. The accountants charge themselves with the amount of inventory, and the account as settled shows a balance in the hands of the administrators to be distributed *according to law* of $13,437.99. Appended *to the administration account* is a statement headed "Nicholas Rittenhouse and Jacob D. Rittenhouse in distributive account with the heirs of Martin Rittenhouse, deceased." An administration account properly settled shows nothing more than the general balance due the heirs after a reduction of the personal estate into cash or its equivalent, and the payment of the debts. Into that account the monies paid to the distributees, or the advancement to one or more of the children, do not enter. They form no part of an administration account. A total disregard of this obvious distinction causes most of the perplexity which attends such settlements. After a final adjustment, the practice is to decree a distribution among the heirs according to law. It is a general decree; for the court do not undertake to ascertain who are the heirs, or what proportion each is entitled to. And it would be most dangerous to do so, and more especially when the only matter *which is properly* before them is to settle and adjust the general balance due from the administrator, and to ascertain the nett proceeds of the personal estate to which the distributees are entitled. The administrator may annex a statement of the monies paid to each of the heirs, so that it may appear that the apparent is not the real sum due. But this he is not bound to do. It constitutes no part of the decree, nor does it bind any human being, except, perhaps, the administrator himself. After the decree, however, the Orphan's Court may proceed to enforce payment, and where this is required by any of the parties interested, in order to do justice, it is necessary to investigate the state of the account of the administrator with each of the heirs; and it is plain that justice only can be done by keeping the accounts of each separate and distinct; for one may

[Rittenhouse v. Levering.]

have received his whole share, another part, and a third nothing. In *Purviance* v. *The Commonwealth*, (17 *Serg. & Rawle* 31), it is held that the Orphan's Court has jurisdiction of the matter of distribution, and is bound to decree distribution on the petition of any one interested, though the usual mode, as is truly said, is by an action at common law.   But before making this distribution, the Orphans' Court should require that such notice should be given to all the parties not before the court, as the nature of the case admits of.   And this is necessary ; for a final distribution of the estate requires great circumspection, and sometimes involves most interesting, doubtful and perplexing questions ; and hence the propriety of avoiding to confound it with a proceeding so entirely different, and intended for an entirely different purpose.

But in this essential respect how lamentably deficient is that part of the account which is called by the plaintiff a distribution of the estate among the heirs !   It in fact is part of the administration account blended with it, and it is very evident that no other notice to the parties was ever given, except the notice of the settlement of the administration account.   No one petitioned the court for that purpose, nor has any notice been given of the specific object, viz., to ascertain and decree the amount to which each was entitled as his distributive share of the estate.   This is so plain on the face of the account itself, that it cannot admit of any doubt whatever.   But to bind the heirs as a conclusive decree of distribution, the general balance of the estate in the hands of the administrator for distribution must in the first place be ascertained.   After this is done, if any one of the heirs wishes a distribution to be made by the court making the decree, he may petition the court for that purpose, have the parties before the court, and a decree made adjusting the sum due to each.   Besides, in the distributive account, as it is termed, the real estate, as valued by a jury of inquest, is blended with the personal estate.   For these reasons I throw out of view the distributive account, as it is called, and also the proceedings on the writ of partition.   The case, therefore, comes down to this.   An administration account is settled in due and regular form, and the Orphan's Court decrees in the hands of the administrator for distribution $13,866.11.   Is this, the decree of the Orphan's Court on this state of facts, conclusive ? or, in other words, is the plaintiff, notwithstanding the decree, he being returned in the inventory as a debtor and charged in the administration account with the same, at liberty to controvert the alleged debt by proof that he owes the estate nothing ?

That the decree of the Orphan's Court is conclusive, is an elementary principle not now open to doubt ; but of what it is conclusive, and whether it concludes a party from alleging the truth to the extent claimed by the plaintiff in error, is not so clear. That it is conclusive of every item or thing in the account as against the whole world, will not be pretended.   For example,

VI. — 26

the debts due the estate form part of every inventory, and are
brought into the administration account; and yet no person has
ever supposed that although they are treated as part of the assets
by the administrator, the debtor is prevented from proving that
no debt existed, and that he owed the estate nothing. In what-
ever manner or with what solemnity and regularity the account
is settled, yet the debtor is not precluded from any defence which
he may have against the claim. This is conceded; but it is al-
leged that a distributee, who is a debtor, is placed in a different
situation; that he is governed by different principles; because, as
is said, being a party to the decree, his time to object is before the
decree made, and being silent then, he cannot afterwards collate-
rally question the decree by a denial of the existence of the debt
in another *forum.* It must be confessed, there is great force in
the position; but, on the most anxious and deliberate reflection, I
incline to the opinion that although evidence, it is not conclusive
evidence of indebtedness. In the case of an ordinary debtor, it
would be no evidence whatever; but where the debtor is at the
same time distributee, it will best subserve the purposes of justice
to consider the decree in that particular as *primâ facie,* but not
conclusive evidence of the debt. The debtor, although distribu-
tee, should be at liberty to rebut the *primâ facie* proof by evidence
that destroys the claim. Although the legal presumption is that
the parties to the decree examine the account, and are acquainted
with each item of which it is composed, yet in practice, and espe-
cially where some of the heirs reside out of the State, it is far
otherwise. In forming an opinion on such a question, we must
have regard to the known habits of doing business; and unless we
sometimes yield to circumstances, the most glaring injustice will
be the inevitable result; for frequently absent distributees may
find themselves deprived of their patrimony by omitting a parti-
cular examination of an account in which they may be falsely
charged as debtors to the estate. At any rate, before they can be
precluded from alleging the truth, they have a right to require
that all the forms of law intended for their protection should be
pursued. In relation to distribution, the District Court has a
concurrent jurisdiction with the Orphan's Court; and I can hardly
suppose that if the parties had thought proper to proceed in the
latter instead of the former court, they would have thought them-
selves prevented from inquiry into the indebtedness of a distribu-
tee, merely because he had been returned in the inventory as a
debtor, and that had formed one item of the administration
account.

The remarks already made dispose of the third and fourth
errors. There was a final settlement of the accounts of the de-
fendants as administrators, and a clear balance, viz., $13,866.11,
ascertained. From this it results that the District Court had
jurisdiction of the subject-matter of the suit.

[Rittenhouse v. Levering.]

It remains to consider the fifth error: that the several counts in the declaration, particularly the third and fourth, are utterly incongruous and inconsistent with each other, and the verdict on which the judgment below was entered being general, is erroneous. This error is not entitled to much favour, as we are aware that the evidence on the exceptionable counts, I mean those relating to the real property, was thrown out of the calculation by the jury. But the error is not sustained, because the counts are not incongruous and inconsistent with each other. Several counts may be joined in the same declaration. The plea and judgment are the same. It would be useless, particularly after a second trial, to send the cause back on such an objection. It is usual, particularly in *assumpsit*, debt on simple contract, and action on the case, to set forth the plaintiff's cause of action in various shapes in different counts, so that if the plaintiff fail in the proof of one count, he may succeed in another. 3 *Blac. C.* 395; 1 *Chitty P.* 399. The error assigned must be taken as a whole; and as the counts are not incongruous and inconsistent, although the verdict is general, we would not feel ourselves justified in reversing the judgment on that ground.

Judgment affirmed.