## Martin Rittenhouse's Estate.

The Orphans' Court has undoubted jurisdiction of advancements, and its decree would be conclusive in an action on the recognisance; but it is not bound to exercise it.

If parties are perfectly aware of what is done in a case in the Orphans' Court, when they are directly interested, and remain silent, and subsequently by their acts acquiesce in the determination of the Court, actual notice will be presumed.

The Orphans' Court will not open a decree that has been acquiesced in by all the parties for a period of 14 years, to suffer a party to avail himself of the statute of limitations.

A bill for a review has often been likened to motions for a new trial, on account of misdirection on a point of law, or for testimony discovered subsequent to the trial, that a party could not, with reasonable diligence, avail himself of before. Such evidence must be relevant, and, in all probability, might change the result of the issue between the parties.

If a party has a legal ground of defence to a case in the Orphans' Court, and does not avail himself of it by an appeal to the Supreme Court, the Orphans' Court will not, on that ground *alone*, after the lapse of many years, when property has been sold under their decree, entertain a bill of review.

A bill of review will not be admitted, except it contain either error in law appearing in the body of the decree, without further examination of matters in fact, or some new matter which hath arisen in time after the decree, and not any new proof which might have been used when the decree was made.

In regard to errors of law apparent upon the face of the decree, you cannot look into the evidence in the case, in order to show the decree to be erroneous in its statement of facts. That is the proper office of the Court on an appeal.

If the parties have notice of the action of the Orphans' Court, in all the stages of their proceedings, and do not avail themselves of an appeal: *Quære*—Have the Orphans' Court a right to set aside their decree after five years, upon the supposition that the Court might change its opinion.

*Oct. 25.*   This case arose in the Orphans' Court of Philadelphia, on a petition in the nature of a bill of review, not under the Act of Assembly of 1840, but by way of an appeal to the general equity powers of that tribunal.   The facts of the case are so fully stated by the Judge in his opinion, when pronouncing the decision of the Court, that no further statement of them is deemed necessary in order to enable the reader fully to understand the subjects in controversy.

The cause was argued by Mr. *Randall* for the petitioners, and Mr. *William Rawle* for the respondents, before Judges KING, PARSONS, and KELLY, at March Term, 1847.

The opinion of the whole Court was delivered by

PARSONS, Judge.—This is a petition professing to be in the nature of a bill of review, praying the Court to open an order and decree

40                    2 D

made by the Orphans' Court of this county on the 17th of September, 1830, awarding certain real estate to the heirs of Martin Rittenhouse, deceased, in pursuance of a valuation which had been made on a writ of partition previously issued therefrom, and regularly returned.

The facts of the case are briefly these : Martin Rittenhouse died on the 22d of July, 1828, possessed of considerable real estate in this county, intestate, leaving three sons, and three daughters who were married.   All these children were in full life when proceedings were commenced in the Orphans' Court to make partition of the real estate of said deceased.   He had another son, who was the eldest, named Joseph, who left this country about twenty years before the death of his father, and was supposed to be dead at the time the proceedings in partition were had.   He left three children—Dr. Joseph Rittenhouse, a son, and two daughters, who at the time of the partition were married, one to Silas G. Levering, and the other to John Alexander, parties to the present petition or bill of review.

On the 28th of December, 1828, a petition was presented to the Orphans' Court, signed by all the children of the said Martin Rittenhouse, deceased, praying a partition of the real estate.   An inquest was awarded in the usual form—the sheriff and jury return that the property could not be divided without injury to, or spoiling of the whole, and therefore, they return a valuation of the same on three different parts or pieces; No. 1, is valued at $1400 ; No. 2, at $7500, and No. 3, at $700, making the whole value $9600.

On the 16th of January, 1829, the report of the inquest was confirmed by the Court, and, on motion of the counsel for the petitioners, a rule was granted on the heirs and legal representatives of the deceased, to appear on the third Friday of February, at 10 o'clock A. M. of said day, then and there to show cause why the same should not be sold, in case the heirs or legal representatives should refuse to elect to take the premises at the valuation of the inquest.   To this rule there is a return of service on some of the heirs ; and a paper is found among the records of the Orphans' Court, in the handwriting of William Rawle, Esq., who was counsel in the cause, and is as follows :—

" Nicholas Rittenhouse,     No. 2,
Jacob Rittenhouse,         " 3,
Thomas Umsted and wife, " 1.

" The following heirs appeared in addition to the above three :

Joseph Rittenhouse, Philip Reiner, Silas Levering, John Alexander. Notice proved on Daniel Nixon and Martin Rittenhouse. Proclamation made. The Court adjudge the property as above taken, and direct the shares of the other heirs to be secured by bond and mortgage on the premises. Endorsed, RITTENHOUSE."

It also appears by the records of the Orphans' Court, that the administrators of Martin Rittenhouse, deceased, settled their account on the 7th of May, 1830, which was confirmed on the 18th of June of the same year *nisi*, and on the 7th of July following, absolutely. At the same time they settle a distribution account, in which Joseph Rittenhouse, the eldest son, who was supposed to be dead, is charged with $4465.75, the amount that he was indebted to his father's estate, and which claim had been returned by the administrators in their inventory. It also appears that on the 1st of September, 1830, Jacob D. Rittenhouse executes a release to Nicholas, and to Umsted and wife, for his share in the real estate taken by them.

On the 6th day of May, 1830, Philip Reiner and wife, Thomas Umsted and wife, and Martin Rittenhouse, execute a release to Jacob D. Rittenhouse, for the part of the real estate he had taken at the valuation. On the 20th of April, 1830, Daniel Nixon and wife assign to Jacob and Nicholas Rittenhouse all of their shares in the estate and purparts which had been taken by him, &c. On the 1st of September, 1830, Nicholas Rittenhouse, Jacob D. Rittenhouse, and Thomas Umsted and Elizabeth his wife, in right of her the said Elizabeth, executed a writing under their hands and seals, electing to take the several parts, Nos. 1, 2, and 3, at the valuation; after which the following decree or order was made by the Orphans' Court, and is entitled of record:—

" In the case of the partition of the real estate of Martin Rittenhouse, deceased. Sept. 17th, 1830. Nicholas Rittenhouse, eldest surviving son of the said Martin Rittenhouse, deceased, having elected to take the premises numbered *two* (2) in the return of the inquest made to this Court on the 16th day of January, 1829, at the valuation thereof; and Jacob D. Rittenhouse, the second surviving son of the said Martin Rittenhouse, deceased, having elected to take the premises numbered *three* (3) in the said return, at the valuation thereof; and Thomas Umsted and Elizabeth his wife, in right of the said Elizabeth, who was one of the daughters of the said Martin Rittenhouse, deceased, having elected to take the premises numbered *one* (1) in the said return, at the valuation thereof; and it appearing to the Court that all the children and representa-

tives of the said Martin Rittenhouse, deceased, have received their full, equal, and proportionable parts of the valuation of the estate of the said Martin Rittenhouse, deceased; it is considered and adjudged by the said Court, that the elections of the said Nicholas Rittenhouse, Jacob D. Rittenhouse, and Thomas Umsted and Elizabeth his wife, be entered of record, as having been made on the 20th day of February, 1829; and that the said Nicholas Rittenhouse hold and enjoy the real estate of the said deceased, numbered in the said return *two* (2), at the valuation as aforesaid, to him, his heirs and assigns for ever, as fully and freely as his said father held the same in his lifetime; that the said Jacob D. Rittenhouse hold and enjoy the real estate of the said deceased, numbered in the said return *three* (3), at the valuation as aforesaid, to him, his heirs and assigns for ever, as fully and freely as his said father held the same in his lifetime, and that the said Thomas Umsted and Elizabeth his wife, in right of the said Elizabeth, hold and enjoy the real estate of the said deceased, numbered in the said return *one* (1), at the valuation aforesaid, to them, the said Thomas Umsted and Elizabeth his wife, and the heirs and assigns of the said Elizabeth for ever, as fully and freely as her said father held the same in his lifetime." It is to set aside or open the above decree that the present proceedings have been instituted.

The principal ground alleged in the bill, and the only ground sustained, either by the admissions of the respondents or by proof, is, that in 1832, Dr. Joseph Rittenhouse commenced an action against the administrators of Martin Rittenhouse, deceased, for a distributive share of his grandfather's *personal* estate, claiming one-third of the seventh part of the same, and that subsequently Levering and wife, and Alexander and wife, also brought suits in the District Court for their respective shares of the personal estate; and that. after various trials in the District Court and in the Supreme Court, they obtained a verdict, it would seem, for $1416.15, as their share of the personal estate of their grandfather. It would seem, from the bill, that the case referred to was decided upon the principle that the confirmation of the administration account of the estate was not conclusive evidence of any debt being due from the said Joseph Rittenhouse, the elder, to the estate of Martin Rittenhouse, deceased. This allegation in the present petition for a review is denied by the answer filed in this proceeding, in the way, that the statements are made as contained therein, relative to the proceedings in the District Court, and the result of said suits; and in said answer

they do not admit, on the contrary, deny the conclusions, both in fact and law, which are stated in the present application.

There is also an averment in the present petition for a review, that Joseph Rittenhouse nor any of his children ever received their part of the valuation of the estate of Martin Rittenhouse, deceased. But this is flatly denied by the answer; and asserted in the same clearly, that in the distribution of the estate, the fullest regard was had to the supposed rights of the children of Joseph Rittenhouse, deceased, and that they had due notice of the proceedings at every stage, when notice, either in law or equity, ought to have been given to them.

But there is no proof before us, in the present proceedings, that the said Joseph had not received his full share of his father's estate before his death, except what appears from the report of the decision of the cause in the District Court, when his children recovered a verdict for a distributive share of the personal estate. Yet, notwithstanding that recovery relative to the personal estate (the correctness of which we do not question, and shall not in the least impugn), there is much evidence to show that when the Orphans' Court decreed a distribution, Joseph had received his portion; and that proof does not then seem to have been questioned, or its potency contradicted, either in law or in fact. Whether rightly decided upon or not, appears now to be one of the subjects in controversy before us.

For the purpose of testing the validity of the decree sought to be reviewed, it may be well to examine in their order all the proceedings of the Court in relation thereto. And first, the parties had the clear right to apply for a partition; it is given by Act of Assembly, and the application is in accordance with the forms of law. The sheriff's return of the inquest, and its being confirmed by the Court without objection, is evidence that all had notice thereof. A rule is granted upon all the parties in interest to appear on a day certain, and elect or refuse to take the property at the valuation, or show cause why it should not be sold. We have before us proof of the service of that rule upon all the children in full life, and of the service upon the children of Joseph, who was dead; for, after seven years' absence, without being heard from, the law presumed his death: Burr *v.* Sims, 4 Whart. 150. The record shows that Levering and Alexander, the present applicants, were in Court on the return of that rule upon the 3d Friday of February, 1829. It is admitted by them on the present record that they appeared on that day.

2 D 2

Nicholas Rittenhouse, Jacob D. Rittenhouse, and Thomas Umsted and wife, elected to take the property, and the Court adjudged it to them, and directed the shares of the other heirs to be secured by bond and mortgages on the premises. All this was in strict accordance with the Act of Assembly; for, although the children of Joseph (he being the eldest son) had the right first to have made the election, representing as they did the interest of their father, we must presume they made no such election. Such is the legal presumption, and although the plaintiffs state in a replication to the defendant's answer that they were in Court, and no questions were asked them, there is no proof of it. On the contrary, the inference is, that they are now mistaken, and at this late day have forgotten the facts.

They admit they were in Court when the order was made adjudging the property to the other heirs, and, had they desired to exercise their priority of choice, it was very easy to have said so. They then made no claim in right of their father. Nor is it now pretended they were in a situation to have taken the property, and given bonds to the other heirs as the law required. They then knew all that was said and done in Court in relation to the estate. And if the case now stood simply upon that order, I suppose we should have no objection to the action of the Court.

But there is another and final decree, that of the 17th of September, 1830, when it was determined by the Court, that it appearing all the children and legal representatives have received their full, equal, and proportionable parts of the valuation of the estate of Martin Rittenhouse, deceased, they adjudge the property to those who elected to take the various parcels at the valuation. Had then the Court the right to make such a decree? This raises the question whether the Orphans' Court have authority to decide upon the question of advancements.

When the sheriff and jury return that property cannot be divided, and a valuation is fixed upon it by them—when none of the heirs are willing to take it; therefore a sale is ordered by the Court; it is sold, and the money is brought in for distribution; it is then indispensably necessary, that the Orphans' Court should determine what amount each heir is entitled to receive. If one has been advanced in part, or to the whole of his share, by the parent in his lifetime, it would be unjust that he should have a full portion. Therefore the question of advancement comes directly before that tribunal. If facts are disputed, that Court has the power to direct an issue to the Common Pleas, to have them determined by a jury. So also when property

has been sold by an administrator for the payment of debts, and there is a surplus for distribution among the heirs, that Court must necessarily settle the amount on such an occasion which each is entitled to receive ; and therefore the subjects of advancements made by the intestate in his lifetime, must necessarily be determined by the Orphans' Court. So also, when an inquest has returned that the property cannot be divided among all the heirs, but a valuation is fixed upon it, and one of the heirs chooses to take it, this tribunal must determine the terms and conditions on which he takes it ; the amount of each bond or recognisance which shall be given to every one, when they are given separately ; and in so deciding they must determine whether either, or all the heirs but him who takes the property, has been advanced to the full amount of their proportionable shares.

True it is, the Court might direct a bond to be given to the Commonwealth in a sum sufficient to protect the interests of all, and let the question of advancement to each heir be determined in an action on the bond. Yet such a course might often jeopard the rights of parties ; for the bond usually runs one year or more, in the mean time witnesses who could prove the facts as to the advancements might die, or the books and papers which contained the evidence thereof might be destroyed by accident or fire. Hence, in my opinion, in many cases, it is generally better to settle the question of advancement to each heir, as the Court did here, when the property is decreed to the person who takes it, and for this tribunal to make a final distribution when the premises are thus adjudged. And particularly when it is manifest to the Court all have been advanced but those who take the property.

That the Orphans' Court have this authority, I do not now consider an open question in Pennsylvania. It seems to me to be settled in the case of Blanchard v. The Commonwealth, 6 Watts, 309. In that case, the Chief Justice remarks : " The Orphans' Court has undoubted jurisdiction of advancements ; and its decree would be conclusive in an action on the recognisance ; but it is not bound to exercise it, nor would it be convenient in practice, or conducive to justice, to do so." " In some parts of the state it has been the practice to take a separate recognisance to each child ; but the costs were necessarily rendered oppressive by it. Where there were many distributees and several purchasers or acceptants of distinct parts of the estate, it has been generally, if not universally, abandoned." He then adds : " Where the sum due to each has been thus awarded, without an adjustment of advancements, it might be

a grave question whether it could be decreased in a suit on the recognisance, which has much of the solemnity of a judgment, especially as the parties had an opportunity of demanding that advancements should be brought into hotchpot before the balances were definitely struck." In that case a bond had been taken to the Commonwealth for the whole amount of the valuation; and it appearing there was no adjudication on advancements in a suit thereon, the defendant was permitted to prove what had been advanced to an heir. In the case of Watson v. Watson, 6 Watts, 254, it is held that, in a case of intestacy, advancements by a father to his children must be brought into hotchpot in estimating the distributive share of each. Of course, if then the Orphans' Court decree distribution, it must and can settle the question of advancements. See also Carpenter's Estate, 4 Barr, 222; Purviance v. The Commonwealth, 17 S. & R. 31.

In the case now before us, that Court did determine, when the property was awarded to those who elected to take it, upon the question of advancement, and that each heir had his full share; and this was a question within their jurisdiction. Why, then, should not this decree stand? What objection can be alleged against it?

That all these proceedings are strictly legal on their face, no one will doubt, if there can be any validity attached to our records. But it is alleged by the petitioners that they had no notice of the decree of 17th of September, 1830. Is such the fact? Let us inquire, and see how the matter stands. Before we enter upon this inquiry, perhaps it is well to reflect, what is there before us to show that these applicants had no notice of that decree? Only the allegation of the petitioners as set forth in their bill; and this averment is flatly contradicted by the respondents in their answer under oath. Hence this assertion of the petitioners is nothing when thus denied, unless it is sustained by proof; and on this ground alone, a Court of Chancery would be justified in dismissing the present bill.

But we are not inclined to assume a position so broad now; and therefore will inquire what there is, to show that these parties had notice.

In the first place, the law presumes that all the parties had notice, and that evidence of the fact was adduced before the tribunal who thus adjudicated upon the rights of the parties. Secondly, it is a reflection upon the professional integrity of the eminent counsel then conducting the proceedings, the late William Rawle, Esq., deceased, to suppose that he would have attempted to induce the

Court to determine upon the affairs of so large an estate, without having all the parties legally notified of the time and place of hearing.    And when we consider the care and caution with which all proceedings in the Orphans' Court were then conducted, by the Judges before whom these proceedings were had, the presumption is overwhelming that the children of Joseph Rittenhouse had full notice of all that was done by the Court in relation to the estate.

But it is said the evidence of such notice of this last decree is not on the record.    When we reflect upon the loose manner in which the records of the Court were then kept by the clerk, it is not surprising that the proof of service does not now appear, or that there is no entry that all the parties were present at the time of the final decree.    Their original appearance had once been entered, therefore, the clerk might have deemed this sufficient. And if we should be very astute in looking into every slight omission on the record, when our officers are changing once in three years, and some times oftener, it is to be feared but few orders of the Court would bear so severe a scrutiny as is now demanded, after the lapse of fourteen years.    Hence the legal presumptions above stated are deemed sufficient until they overthrown.

How does the question stand in point of fact ?    All parties had notice of the petition and of the inquest.    All the parties appeared, or had notice to appear on the 3d Friday of February, 1829, and were present, and heard three of the heirs elect to take the property at the valuation.    These are facts undisputed, and established by the clearest proof.    How is the fact with regard to notice of the subsequent proceedings ?    Mr. William Rawle was examined as a witness by the plaintiffs—his deposition is before us. He was counsel with his late father in the application for the partition.    In his deposition he says, " I have as strong an impression as I can have at this distant period of time, that Dr. Joseph Rittenhouse was apprised of everything that took place in the proceedings in the case, and knew all about it.    I cannot state any particular conversation I had with Dr. Joseph Rittenhouse, but I have a strong impression that I had various conversations with him."    (And then adds :)    " I have a very strong impression that Dr. Rittenhouse was satisfied that the children of Joseph Rittenhouse had no claim upon the estate.    I have a very clear recollection of *that*.    And that he went to New Orleans for the purpose of prosecuting a claim upon some property which belonged to Joseph, his father."    Here then, we have *direct* evidence of notice, which

41

is in accordance with the legal presumptions, and the action of the Court.

If an issue had been directed to try the question of notice being given to these parties, and, on the law and the facts above stated, a jury had found that notice was given, would any Court set aside such a verdict, with this array of proof before them.? I think not.

But the consideration of this part of the case does not rest here; for there is a series of other facts and circumstances existing in the cause, apparent as well from our own records, as from facts which have been laid before us by proof, which leads the unbiassed searcher after truth to the inevitable conclusion that the heirs of Joseph Rittenhouse, deceased, were fully apprised of all the actings and doings of the Court in relation to the estate; and, as this is an appeal to the equitable discretion of the Court, if they had such notice, then the basis of the present application falls to the ground; for we have already shown that the record is in strict accordance with law; and first, they had notice of the settlement of the administration account of those who administered upon the estate of Martin Rittenhouse, deceased; second, the amount claimed to be due from their father to the estate of their grandfather is mentioned therein as so much advanced to him. Within the period prescribed by law for an appeal from that decree, they set forth in this petition that a suit was brought in the District Court for their distributive share of the personal estate.

This is an admission of actual notice of what appeared on that account, and of course, we may infer, of what had been decreed against them. If these heirs *then* thought injustice had been done them in reference to the distribution of the real estate, why did they not then appeal to the Supreme Court, or, if a decree involving such results had been pronounced against them *without notice* thereof, why not *then* apply to the Orphans' Court to set the same aside? All then concerned in conducting those proceedings were in full life, and the truth on the point of notice or *not*, could have been readily shown.

Another important fact in this series: it is asserted in the answer of the respondents under oath, and not contradicted by any evidence in the cause, and therefore we are bound to take it as true, that those to whom the property was respectively awarded went into possession under said decree of the 17th of September, 1830, and made valuable improvements on the shares allotted to each. That on one portion of the property, improvements have been made to the value of $2000 and more; on another, to the value of $880.

That on another there are improvements which cost upwards of $5000; and it is further stated in the answer, that, during the progress of these improvements, the present petitioners resided in the neighbourhood of the premises, and never gave to those persons to whom this property was decreed, any notice of their pretended claim to this estate, or of their intention to apply to this Court to revoke said decree, until the presentation of this petition.    On the contrary, for aught that appears to the *Court*, the parties have acquiesced in the same for a period of fourteen years, without attempting in any way to disturb it; although they were pursuing their claim as to the personal estate in another tribunal.

. With these facts before us, what is the result?    Taking the broadest ground of general equity, without any regard to legal rules, can the mind come to any other conclusion than that the plaintiffs *had notice* of all which was done by the Orphans' Court?

Such silence and acquiescence as that we have just alluded to, is perfectly consistent with the fact that they were fully aware of the decree of the Orphans' Court of 17th September, 1830, and is utterly irreconcileable with any other idea, judging these parties by the ordinary standard of human conduct and actions.    Had they been in the state of ignorance of this decree now alleged, would they *not* have made some movement to obtain the money or securities decreed to them, in common with the other heirs of Martin Rittenhouse, deceased, on the 3d Friday of February, 1829, when they aver they were in Court, and must have heard all that passed? Would they have permitted the parties to whom the property had been decreed to go into the possession and enjoyment of it, which, by the terms of that decree, they could only do on paying or securing to them their distributive shares; without requiring them to comply with the decree as it respected their interest under the same?    So far from doing so, they never present themselves to this Court, asserting any right under that decree, until fourteen years after they saw the accepting heirs in the quiet possession of the estate, placing thereon valuable improvements, and exercising under their daily observation every act of ownership over it.    Such a course of conduct would be precisely that which parties fully aware of the decree of the 17th September, 1830, would have pursued, and none other.

Can we believe that parties who know nothing of the proceedings of this Court beyond the decree of the 3d Friday of February, 1829, which decreed and awarded to them a large sum of money; a decree

they were aware of from being present when it was made ; have stood still from that time to the presentation of this petition, without a demand on this Court to carry their decree of that day into effect as it respected the interest derived by them under it? Assuredly not. If, however, they had been apprised that the Court had subsequently determined that a state of things existed which nullified or took away any apparent interest they might otherwise have enjoyed under that decree ; then all the facts of the case harmonize with reason, common sense, and the ordinary course of human conduct.

The whole evidence in the cause cannot be reconciled upon any other hypothesis than that these petitioners *had notice* of the last decree of the Court. No other conclusion is consistent with the ordinary judgment which we exercise in deciding upon the motions which influence the actions of our fellow men.

I have endeavoured to demonstrate, from the succinct statement already given of the facts, that the conclusion is irresistible that these parties knew of all the proceedings in relation to the estate, and how their pretended legal rights were disposed of; that they did know of the decree in time to have taken their appeal to the Supreme Court, if they believed injustice was done them, is a fact, if not admitted, at least to be inferred from what is stated in the petition ; therefore, upon the allegation of the want of notice, the case is clearly against the plaintiffs, and if there was no other question in the cause, in my opinion this application ought to be dismissed.

But what is the peculiar equity on which the present application for review is based ? We are told that, when the cause was tried in the District Court, they were enabled to convince a jury that the debt, or sum advanced by Martin Rittenhouse to his son Joseph, was barred by the statute of limitation, at the time of the death of the former.

Where is the equity of such a claim ? The integrity of the original indebtedness is not disputed. When a Court of law opens a judgment to let in a defence on the merits, it is generally on terms that the defendant will not plead the statute of limitations, if it can be done. But, when an appeal is made to the sound discretion of the Court to open a judgment to let in an equitable defence, or set-off, was it ever done to suffer the party to avail himself of the plea of the statute of limitations ? I think no such case can be found. Did any Court ever grant a new trial after verdict, purely upon the ground that a party had discovered that he could successfully sustain the plea of that statute in bar of a just claim asserted by

the plaintiff? If there is such a decision to be found, I have never seen the case, nor have counsel cited any such on the argument.

A bill of review has often been likened to a motion for a new trial, in consequence of misdirection in point of law, or for testimony discovered subsequent to the trial, that the party could not, with reasonable diligence, have obtained before; which is new and relevant, and in all probability might change the result of the issue between the parties. But, if the evidence was known, or with reasonable diligence could have been obtained, the verdict is not disturbed. We have shown, from the whole case, these applicants knew all that they now do relative to the facts, or might have known it. When they brought their action in the District Court, it was founded upon the facts they proved at the trial. If they thought them available, they should have taken their appeal at the same time, and let both have gone on *pari passu*. This they did not do. Then it is not for this Court to correct their errors, or remedy their omissions on a question so vital to their interests, especially as the case has no standing on its original merits.

Fourteen years have rolled by since the decree was made, and twelve when it must be conceded they were cognisant of their rights, and when first ascertained, they had a remedy by appeal. Since then, valuable improvements have been made upon the land, and a part of it sold under the solemnity of that decree which we are now asked to disturb. In our opinion it ought not to be done, and these applicants have no equity in their claim.

But we are told there have been two solemn decisions of the Supreme Court in relation to the personal property, and if we refuse this re-hearing, we shall go counter to their determination. Such, we apprehend, is not the case. We do not question the soundness of their judgment on the case then before them, and probably we should have decided the law of that case in the same way. Another and different question is before us, depending for its determination on different rules of law from those invoked in the decision of that cause. In that case, the party came before the Court, depending upon abstract legal rights, and asked for a decision on a subject which had not been finally adjudicated upon; but which then was a subject of revision for another Court. In the present case, the decision is final. No appeal was taken in time, and we are asked now to set aside a decree which the Court thought was just, when made on the facts before them. We think so still; for, if the parties did not choose to avail themselves of what the Supreme Court have determined was a legal ground of defence, it was their own

2 E

folly, for which we think they alone should suffer. They have had their day in Court.

From a careful examination of the decision of the Supreme Court on the action brought in the District Court, as reported in 6 W. & S. 190, I am satisfied the question now before us was not in any manner considered by that tribunal. Judge Rogers, who delivered the opinion of the Court, says that he throws out of view "the proceedings on the writ of partition." He simply decides that, in relation to the personal property, the distributee being a debtor, and so stated on the settlement of the administration account, is *primâ facie*, but not conclusive evidence of the debt. And the debtor, although a distributee, shall be at liberty to rebut *primâ facie* proof, by evidence which destroys the claim. But in that opinion, on p. 201, he clearly lays down the doctrine that, where the Orphans' Court decrees a distribution on notice to all the parties in interest, they are concluded by it.

I have clearly shown, I think, that these parties had notice of the distribution of the proceeds of the real estate, and, if they had, such decree now binds them by the doctrine asserted in that case. As no appeal was taken, so far from our conclusion upon the present application being adverse to anything ruled by the Supreme Court, I conceive our conclusion is in strict accordance with the principles given by that tribunal; for no one who reads the opinion of that learned Judge can doubt, if there had been a formal decree of distribution of the personal property in the hands of the administrators deciding that, on full consideration of the case, Joseph Rittenhouse had been fully advanced by his father the entire share of his estate, that such decree would have defeated the recovery by the plaintiffs in that action. As to the real estate, such a decree was entered, hence they are concluded.

From the view already taken of this cause, on its merits, it would perhaps seem unnecessary to pursue our inquiry any further; but there is a legal objection raised on the argument, and very well discussed, which seems to demand a passing notice; and, if the Orphans' Court were to adopt the principles which usually govern Courts of Chancery when deciding upon bills of review, we should find that the present application is not embraced in any of them. Indeed, it seems to me, from the rules which usually govern Courts of Equity when such cases are presented, this would not be listened to with the least favour. Let us inquire what they are.

It is said: "No bill of review shall be admitted, except it contain either error in law, appearing in the body of the decree, with-

out further examination of matters in fact, or some new matter which hath arisen in time after the decree, and not any new proof which might have been used when the decree was made :" Story Eq. Pl. § 404.

There is another rule peculiarly applicable in the present case, with regard to errors of law apparent upon the face of the decree : you cannot look into the evidence in the case in order to show the decree to be erroneous in its statement of facts.    That is the proper office of the Court upon an appeal.    But, taking the facts to be as they are stated on the face of the decree, you must show that the Court have erred in point of law : Story Equity Pl. 407.

The doctrine is very fully considered by Lord Eldon in the case of Parry v. Phelps, 17 Vesey, 178, and is undoubtedly the rule in the English Chancery Courts : see Story's Eq. Pl. § 407.    If, then, we adopt this rule in the present case, it is easy to be shown the plaintiffs have no standing in Court on this application.    For it is manifest the Orphans' Court had jurisdiction, and, if the facts justified it, could properly make the decree.    It has determined that it appeared to them that the children and representatives of the deceased had received their full, equal, and proportionable parts of the valuation of the estate.    Now if the facts on which judgment was then formed are erroneous, if the Court were in error in their statement of facts, the remedy this party had was by appeal, and he had three years to enter the appeal.    But, according to the well settled rules of law in relation to bills of review in Courts of Chancery, there is no ground for having this decree of the Court reconsidered on the face of the present bill or petition.    Whether it is right for the Orphans' Court in this state to adopt the principles just stated as their rule of action, I do not now determine.

This rule has been adopted in the state of New York, and the case of Weiser v. Blackley, 2 John. Ch. Rep. 488, decides that a bill of review must be either for error in point of law apparent on the face of the decree, or for some new matter of fact relevant to the case discovered since publication passed, and which could not, with reasonable diligence, have been discovered before.

In this opinion that Court is sustained by Mellish v. Williams, 1 Vernon, 166 ; and in the case of Young v. Keighley, 16 Vesey, 351, where the Chancellor thought there might be much equity in the claim, and perhaps injustice in still adhering to the rule, yet the Court did, although the Judge remarked he did it with reluctance ; and Taylor v. Sharp, 3 Peere W. 371, is directly to the same point.

There are also one or two other rules in relation to the subject of bills of review, which it seems to me are very proper to be noticed in the present cause.   A bill of review may be brought on the discovery of new matter; and even then, before it can be filed, leave of the Court must be obtained, and the facts verified by affidavit, and clearly stated, so that the Court can determine upon its *relevancy* and *materiality*, for it must be *relevant* and *material :* Story, § 412.   And in the next place the matter must not only be new, but such as the party, by the use of reasonable diligence, could not have known; for if there be any laches or negligence in this respect, that destroys the title to the relief.

It is an incontrovertible fact, that this is not new matter that has been discovered in the present case.   The petitioners knew of the decree; they knew whether they had notice of it or not; they also had all the light relative to the advancement to their father which they now have; for they brought their action to recover their distributive share in the District Court in 1832, when they had by law an undoubted right to an appeal.   And what was the ground of that suit?   That the debt which was due by their father to the estate of their grandfather, which this Court decided was an advancement, was barred by the statute of limitation.   This is a fact they must have known when the decree was made; for it was in the inventory of the administrators, it was in the administration account, and formed the basis of the decree of the Orphans' Court, and was the foundation of their action in the District Court. Therefore, if we adopt all or any of the rules which usually govern Courts of Equity in deciding upon bills of review, the conclusion is irresistible that we are compelled to dismiss the present application on legal grounds.

I have thus far considered the case on the facts which arise, and abstract legal rights which pertain to the parties under them; but there is a broader ground, which, in my opinion, ought not to escape the observation of the Court.   If the parties had notice of the action of the Orphans' Court in the premises (and of that fact we have no doubt), what right has the Court to set aside this decree, when the period for an appeal has rolled by?   From whence does the Orphans' Court derive any such authority?   Can this Court in an arbitrary manner take from these respondents their land, which has been legally adjudged to them, and give it to another, purely upon the ground that if the decree was opened we might be induced now, fourteen years after, to decide differently from what was then determined by the Orphans' Court?   If we should so rule, what man

in the community who holds property under a decree of the Orphans' Court, on a writ of partition, would deem his title safe ? In my opinion such doctrine would be attended with fearful consequences, as to titles to land throughout the state. Let such a principle be once established, and we should greatly reduce the value of real estate when the title was derived from proceedings in the Orphans' Court. Heretofore great confidence has been reposed in such titles, and we are not disposed to rule any principle which is calculated to shake, much less destroy it. Hence, the Court are unanimously of the opinion that the petition be dismissed, with costs.